UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

FRANK DAVIS                                                                    PLAINTIFF

v.                                                      CIVIL ACTION NO. 3:19-CV-849

UNIVERSITY OF LOUISVILLE PHYSICIANS, INC.                      DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court on the motion of Defendant University of Louisville Physicians Group, Inc. ("ULP") for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(a). Def. Mot. Summ. J., DN 43. Plaintiff Frank Davis ("Davis") filed a response, and ULP replied. Pl. Resp., DN 52; Def. Reply, DN 58. These matters are now ripe for adjudication. For the reasons stated below, the motion for summary judgment will be granted. ULP has also filed a motion to exclude the testimony of Dr. Paul Brown. DN 44. The Court has considered Brown's testimony in the context of this decision. The motion to exclude will, therefore, be denied.[1]

I.    *Procedural Posture of Case*

On November 19, 2019 Davis filed a complaint against ULP and University of Louisville ("UofL") in the Western District of Kentucky alleging age discrimination and retaliation in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") and the Kentucky

---

[1] The Court does not address the admissibility of Brown's testimony herein. The Court has only determined that this evidence is ineffective to overcome summary judgment for the reasons stated.

Civil Rights Act ("KCRA"). Pl. Compl., DN 1, PageID# 4-8. UofL was dismissed as a defendant on August 20, 2021. ULP now moves for summary judgment pursuant to Fed. R. Civ. P. 56(a). DN 43.

II.    *Factual Background*

In October of 2017, at the age of 59, Davis accepted an offer for dual employment with ULP and UofL as an at-will Certified Surgical First Assistant ("CFA"). DN 52-1, PageID# 1028. In addition to certain "minimum education and experience requirements," the job description for the CFA position listed "job responsibilities," including "harvest[ing] native vessel(s) used for bypass or other conduit" and "dissecting vessel branches," as well as "other surgical assistance as required by the surgeon." DN 43-4, PageID# 553. Additionally, the job description enumerated certain "knowledge, skills, and abilities" that the CFA was expected to display:

- Practice of medicine within the scope of license.
- Practice of medicine within the scope of training.
- Practice of medicine within the scope of credentialing
- Practice of medicine in accordance with the current standards of care
- Practice of medicine in accordance with the quality criteria adopted by the clinic
- Promotes a safety- conscious work force and maintains good housekeeping practices
- Demonstrates the ability to assess, plan, implement and evaluate individual patient care appropriate to the age of patients served by demonstrative knowledge of the principles of growth and development over the life span.
- Communicates appropriately with the person served regardless of their age.
- Initiative, communicator, problem solver
- Proactive - anticipates and plans for problems before they arise
- Service Excellence - responsive, informs constituents of process, pleasant to work with, educates and provides timely, accurate information
- Organized - manages time effectively, keeps tasks appropriately prioritized
- Flexible - ability to change directions as needed for the good of the department or organization

- Critical Thinking - ability to think through issues and identify appropriate options
- Work Ethic - motivated, diligent, industrious and persistent in the workplace, stays on tasks to completion, works at a fast pace to ensure optimal efficiency
- Maintains a professional appearance at all times.
- Interpersonal - can build effective, strong working relationships with employees, colleagues, management, consultants, and media through trust, communication, and credibility
- Team - ability to work with others, serve others, help others, lead others, mentor others, take directions from others in the interest of moving process and programs forward to the desired outcome.
- Emotional Intelligence - ability to not take issues personal, see the big picture in emotionally charged situations and respond in a mature, professional, composed manner
- Self- Awareness - ability to reflect, understand limitations, and seek appropriate assistance and guidance

*Id.*, PageID# 554-55.

When Davis was hired, he worked under the supervision of Lisa Motley ("Motley"). DN 43-3, PageID# 542. Motley served both as Executive Director at ULP and as Director of Finance and Administration, an Assistant to the Chair of Cardiovascular and Thoracic Surgery at UofL. DN 52-3, PageID# 1065. Dr. Mark Slaughter ("Slaughter") was the Chair of Cardiovascular and Thoracic Surgery. DN 43-10, PageID# 687. Thus, Motley worked, in part, for Slaughter at the time of Davis' employment. DN 52-3, PageID# 1066.

Davis was placed on a Performance Improvement Plan ("PIP") on August 7, 2018, which put him on notice of deficiencies in his job performance and informed him that he needed to show improvement to avoid disciplinary action. DN 43-19, PageID# 756. The letter accompanying the PIP identified Davis' performance issues with specificity and was signed by Motley. *Id.*, PageID# 756, 758. The criticisms of Davis' work included his "diminished" capacity to "endoscopically harvest viable vein efficiently" and "not tak[ing] appropriate initiatives to contribute . . . to the procedure." *Id.* The letter also referenced a "recent confrontation" between Davis and a "Dr.

3

Ganzel," which ULP claimed "was inappropriate and suggest[ed] a lack of self-awareness as to [Davis'] clinical capabilities and how that impacts first assistant case assignments." *Id.* In addition, the letter indicated that Davis had acted with insubordination in violation of ULP policy by refusing to "take call." *Id.*

The letter also notified Davis that his performance would be re-evaluated "at least once every 30 calendar days up to a maximum of 90 calendar days" and warned that a "failure to meet the performance expectations and show improved performance may result in termination of employment." *Id.*, PageID# 756-57. The PIP outlined the expectations Davis needed to meet, directing Davis to "accept constructive feedback and display a willingness to self-educate and learn from experienced peers," to keep a log of vein harvests, to "remain[ ] attentive throughout the entirety of [a] case," to participate in rather than just observe cases, to "anticipat[e] each surgeon's needs," and to "communicate with co-workers, surgeons, and management in a professional and courteous manner at all times." *Id.*, PageID# 757. Motley delivered the PIP to Davis on August 7, 2018. DN 43-3, PageID# 543; DN 43-9, PageID# 654.

Less than a week after being placed on the PIP, Davis filed an internal complaint with UofL claiming that he had been the victim of age discrimination. DN 43-9. In this complaint, Davis alleged that, upon delivering the PIP to Davis on August 7, Motley indicated that Davis lacked certain skills due to his age, told him that "as we get older, we find things we use [sic] to do now more difficult," and commented that his hair was getting grayer. *Id.*, PageID# 654; DN 52-2, PageID# 1049. He also claimed that his coworkers ridiculed him because of his age and that Motley "turned a blind eye" to this behavior. DN 43-9, PageID# 655. Ultimately, Davis contended that Motley put him on a PIP, not because he was underperforming, but, at least in part, due to his age. *Id.*, PageID# 655-56. After conducting an investigation, UofL reported on September 26, 2018

that, "based on a preponderance of the evidence and the totality of the circumstances, Ms. Motley did not engage in behavior of any type that created a 'hostile environment' based on age." DN 43-11, PageID# 716. Nonetheless, Davis was removed from under Motley's supervision and began working directly for Slaughter. DN 52-2, PageID# 1055-56. After submitting his internal complaint, but before UofL issued the findings of its investigation, Davis filed a claim with the U.S. Equal Employment Opportunity Commission ("EEOC"), charging ULP with the same allegations of age discrimination that Davis set out in the internal complaint with UofL. *See* DN 43-5, PageID# 582-83; DN 43-13, PageID# 720.

On September 12, 2018, Slaughter met with Davis and informed him that he was still performing below expectations. DN 43-10, PageID# 706; DN 52-2, PageID# 1061. Slaughter considered this meeting to be the first "30-day follow-up meeting" required by the PIP. DN 43-10, PageID# 706. In an email the next day, Slaughter confirmed certain "action items" that he and Davis had discussed during their meeting, including using a "revised performance sheet to document time to procure vein and quality" and "determin[ing] specific non-operating room assignments so everyone is clear on what [Davis'] responsibilities are when finished in the OR." DN 43-12, PageID# 718. Slaughter indicated that that they would meet again in two weeks to "go over progress and additional questions." *Id.*

Two days after the meeting with Slaughter, Davis filed a second internal complaint with UofL, this time claiming that, after filing his age discrimination complaints, he "began to experience retaliation by [his] employer." DN 43-13, PageID# 720. As examples of retaliatory conduct, Davis claimed that, subsequent to his complaints, he was given "unfair and harsh assignments," stripped of certain "supervisory responsibilities," unfairly assigned to be "on-call" during holidays, and subjected to "increased scrutiny." *Id.*, PageID# 720-21. Davis further claimed

that he was experiencing inequitable treatment relative to the two other CFAs who worked with him. *Id.*, PageID# 722.

In the weeks following Davis' placement on the PIP, ULP documented a number of complaints and comments related to Davis' poor performance. *See* DN 43-14. On September 17, Slaughter noted that "[a]s second assistant [Davis] stands with arms folded and does not participate." *Id.*, PageID# 729. Nurse Alyssa Hobbs wrote to Slaughter, on September 24 to express concerns about two incidents that that she witnessed during a case on September 18, stating:

> I wanted to inform you of two incidents that occurred during Dr. Ganzel's first . . . case on 9/18/2018. Frank Davis was assigned as the first assist for the case. When asked that morning how many vessels would be done Frank stated, "I think 3 vessels." It wasn't until draping was finished and the timeout was done that Frank asked Dr. Ganzel how many vessels were needed. Frank had a knife in his hand, ready to make incision, when Dr. Ganzel informed him that he would not be using leg vein. All supplies had been opened and were then wasted. The second incident occurred at the end of the case when drapes were being cut down. Frank has been asked multiple times by circulating nurses to slow down when cutting drapes off. While cutting, he cut through the cuff of the ET tube. He quietly told the anesthesia resident what he'd done but did not inform either of the nurses in the room. The anesthesia resident . . . also did not speak up about the problem nor did he call his attending. The RN in the room . . . noticed an issue with the patient's breathing and spoke up. She then told the resident to call his attending immediately. [The attending physician] arrived and controlled the situation. When [the attending physician] questioned what had happened, Frank sat on a stool off to the side of the room and did not speak up about cutting the [tube].

DN 43-14, PageID# 726-27.

On September 21, Dr. Sell-Dottin commented that Davis "doesn't anticipate next steps well." DN 43-14, PageID# 731. Regarding Davis' performance during another surgery that same day, Dr. Sell commented that Davis "lacks social awareness, talks at inappropriate times," "does

not respond to appropriate suggestions/coaching," and conducted a "slow, low quality vein harvest." *Id.*, PageID# 732. Sell also noted that Davis "dropped [a] vein on OR room floor." *Id.*

Another surgical assistant, Teresa Ray, wrote to Slaughter, confirming Sell's account of the events of September 21. *Id.*, PageID# 724-25. Ray explained that Davis "had placed the [container holding the vein] inappropriately around the cords" of the vein harvesting system. *Id.*, PageID# 725. Davis then "told the [circulating nurse] that she could take away the vein harvesting system," but, because, he had not disconnected the system, "the [container] where the vein was placed [fell] to the floor." *Id.* Ray expressed her concern, stating, "It was extremely difficult to witness everything that transpired and to feel helpless; for the patient, for the surgeon, and for my co-workers. To me this is beyond inadequate patient care." *Id.*

UofL delivered a Recommendation of Termination to Davis on September 26, 2018 and placed Davis on administrative leave until UofL made a "final determination" about Davis' employment. DN 43-15. UofL finalized the termination of Davis' employment effective October 11, 2018. DN 43-16, PageID# 737. ULP terminated Davis' employment effective September 27, 2018. DN 43-17. At that time, Davis was 60 years old and had worked as a CFA for ULP for just under a year. DN 43-3, PageID# 548; DN 52-1, PageID# 1028.

In the notification sent to Davis, ULP indicated that Slaughter made the decision to terminate Davis' employment after Davis failed to show improvements in his job performance as required by the PIP and also after Slaughter received and reviewed "multiple statements from multiple providers citing errors in the operating room that caused great concern for patient safety." DN 43-17, PageID# 745. ULP claims to have offered to meet with Davis prior to his termination to discuss the allegations against him and allow him to review the statements that had been submitted to Slaughter. *Id.* Instead, Davis tendered a written rebuttal to the alleged grounds for his

termination. DN 52-12. Prior to his decision to terminate Davis, Slaughter reviewed this rebuttal. DN 43-17, PageID# 745. Davis denied being responsible for "dropping a vein on the floor" on September 21 and, while he admitted to cutting the ET tube on September 18, he claimed that this mistake was due to the negligence of another employee. DN 52-12, PageID# 1114. Further, Davis stated the following:

> Surgery and medicine is [sic] not an exact science or profession. All staff makes inadvertent "mistakes," from inadvertently cutting wrong tissue, or damaging organs, bowel or other structures or more. To single one person out and place unfair and harsh scrutiny on a person is clear evidence of an intent to discriminate due to my age and to retaliate against me for complaining of discrimination in the workplace.

*Id.* Additionally, Davis alleged that ULP representatives conspired against him to "fabricate" and "exaggerate" the "facts" cited by ULP in support of terminating his employment. *Id.*

### III.   *Legal Standard for Summary Judgment*

Summary judgment is appropriate when the moving party shows that, for each claim or defense on which judgment is sought, there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party may show the absence of any genuine issue of material fact by "demonstrating that the nonmoving party lacks evidence to support an essential element of its case." *Ford v. GMC*, 305 F.3d 545, 551 (6th Cir. 2002). A fact is "material" if its resolution might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or

other materials" that negate an essential element of the nonmoving party's claim. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. 317 at 322.

If the moving party makes this showing, "the burden . . . shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. DOT*, 53 F.3d 146, 150 (6th Cir. 1995). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Rather, to overcome a motion for summary judgment, the nonmoving party must produce "significant probative evidence." *See Moore*, 8 F.3d 335, 339-40 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court must view the evidence in the light most favorable to the non-moving party and grant a motion for summary judgment only "if the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party." *Cox*, 53 F.3d 146, 150 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989)).

IV.    *Adverse Action*

To pursue an employment discrimination or retaliation claim, the employee must show that his employer engaged in some "adverse action" against him. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (stating that the plaintiff must show that "age was the 'but-for' cause" of an "adverse action" taken against him by his employer); *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 802 (Ky. 2004) (stating that under both federal and Kentucky law, "a 'plaintiff must identify a materially adverse change in the terms and conditions of his employment to state a claim for retaliation'").

Davis has alleged an array of vague and largely unsubstantiated acts committed by ULP that he claims constitute "adverse employment actions." In his complaint, Davis makes the general assertions that, during his employment he "was shunned from conversations, assigned unfair and harsh assignments," "was treated differently than similarly situated, younger employees, on account of his age in the terms and conditions of his employment," "was subjected to harassment and disparate treatment due to his age," and "was accused by agents of the Defendants of not possessing the skills necessary to perform the job duties required of him as [a] . . . CFA." DN 1, PageID# 4-5. Davis also alleges that ULP unlawfully retaliated against him by "subjecting him to unjust scrutiny in his job performance, by removing certain supervisory responsibilities, by making false allegations of misconduct resulting in unwarranted disciplinary action against the Plaintiff, by making unwarranted and derogatory comments about the Plaintiff's ability to perform his job with the Defendants' satisfactorily, by subjecting him to different terms and conditions of employment with the Defendants when compared to other comparable employees who had not engaged in 'protected activity,' and by subjecting the Plaintiff to adverse employment actions up to and including the termination of his employment." DN 1, PageID# 6, 8.

ULP contends that, besides being discharged from his employment, the rest of the acts that Davis alleges do not constitute "adverse employment actions." DN 43-1, PageID# 527; DN 58, PageID# 1157. For a "change in the terms and conditions of employment" to be considered "materially adverse," it "must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.

1999). "Reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." *Stewart v. Esper*, 815 F. App'x 8, 17 (6th Cir. 2020) (quoting *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) (internal quotation marks omitted). To assess whether an employment action is "adverse," "the question is whether the employment action was 'objectively intolerable to a reasonable person.'" *Id.* (quoting *Policastro*, 297 F.3d at 539).

While the termination of Davis' employment was unquestionably an adverse employment action, Davis has not produced evidence, or even attempted to proffer an argument, to show how the remaining acts he alleges should be classified as "adverse" under the law. Davis does not make any effort to explain how ULP employees "shunning" him from conversations, engaging in "harassment," making "unwarranted and derogatory comments," or making "false allegations" constitutes adverse employment actions committed by the defending party.[2] Davis contends that the creating of an on-call schedule was a "supervisory responsibility" that was "removed" from him in retaliation after he filed his complaint, but he does not evidence that taking this duty away "significantly diminished" the "material responsibilities" of his job. DN 52-2, PageID# 1060. Davis also claims that the fact that he was given some "additional administrative duties" is evidence of retaliation, yet he does not show these additional tasks were more than "a mere

---

[2] Davis has not pointed to evidence in the record to corroborate these claims. He alleges that his co-workers made "discriminatory comments related to his age," including "come on old man, let's go to lunch," having trouble bending over?," and "look at that gray hair, it's getting grayer." DN 52, PageID# 1003, 1005. However, he does not identify which individuals made these comments nor does he explain how these comments, if true, could be considered adverse employment acts under the law or how ULP could be held accountable for such comments. Davis does cite one specific incident in which a co-worker wore a label with the name "Crash Davis" on it, which Davis took as a personal affront. *Id.*, PageID# 1005. The Court notes that Davis made similar accusations in the internal discrimination complaint he filed with UofL and that, after an internal investigation, UofL was "unable to confirm harassing comments were made to Mr. Davis." DN 43-9, PageID# 655; DN 43-11, PageID# 715. Regarding the "Crash Davis" nametag, UofL reported that the employee wore it "as a joke" and that it was in reference to a character from a movie, not to Frank Davis. DN 43-11, PageID# 715. UofL's report has been entered into the record (DN 43-11) and Davis does not offer any evidence to refute the findings of the report.

inconvenience or an alteration of job responsibilities." *Id.*, PageID# 1059. Regarding the "unjust scrutiny" and "disparate treatment" to which Davis alleges to have been subjected, he does not proffer any evidence indicating that he was being treated differently than any other employee on a PIP. Finally, there has been no showing that the any of the purported changes to his job led to differences in his "salary, benefits, title, or work hours" or that the changes would have been "objectively intolerable to a reasonable person." In sum, Davis fails to establish that he was subjected to any materially adverse employment action by ULP aside from being terminated from his job. Thus, Davis' termination is the only action that will be considered in this motion.

V.     *Age Discrimination Claim*

A. *Applicable Law*

Both state and federal law prohibit employers from discriminating against employees based on age. Ky. Rev. Stat. Ann. § 344.040(1) (West); 29 U.S.C. § 623(a)(1). In Kentucky, state claims of age discrimination brought under KRCA are "analyzed in the same manner" as claims brought under the federal ADEA. *Williams v. Tyco Elec. Corp.*, 161 F. App'x 526, 531 n.3 (6th Cir. 2006); *Williams v. Wal-Mart Stores, Inc.*, 184 S.W. 3d 492, 495 (Ky. 2005). To prevail on a claim of age discrimination, the plaintiff must show that "age was the 'but-for' cause" of an "adverse action" taken against him by his employer. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). Where a plaintiff lacks direct evidence to support an age discrimination claim, the plaintiff must establish a prima facie case under the *McDonnell-Douglas* burden-shifting test using indirect or circumstantial evidence. *Diebel v. L & H Res.*, LLC, 492 F. App'x 523, 526 (6th Cir. 2012) (citing *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007). Finally, if the plaintiff establishes a prima facie case, "a defendant may offer any legitimate, non-discriminatory reason for the employment action, which the plaintiff may rebut by evidence of pretext; however, the

burden of proof always remains with the plaintiff." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, (1993)).

B. *Direct Evidence*

ULP contends that Davis has offered "no direct evidence of age discrimination is this case." DN 43-1, PageID# 521. "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was [the] motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (*en banc*) (internal quotation marks omitted). "It does not require the fact finder to draw any inferences to reach that conclusion." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

In age discrimination cases, a court considers whether evidence is "direct" by evaluating the following factors: "(1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the challenged employment act." Diebel, 492 F. App'x at 527 (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002) (internal quotation marks omitted)). "No single factor is dispositive; they must be evaluated as a whole." *Id.*

According to Davis, Motley's alleged age-related comments to Davis on the day she delivered him the PIP constitute "sufficient direct evidence to show that he was subjected to intentional discrimination on account of his age." DN 52, PageID# 1014. ULP denies that Motley made the statements Davis claims, but contends, that even if she had, the statements do not constitute direct evidence of age discrimination, as Motley was not in any way involved in Davis'

13

termination. DN 43-1, PageID# 521-22; DN 43-10, PageID# 697 (discussing an interrogatory response in which Slaughter stated that "Dr. Mark Slaughter and Dr. Toni Ganzel made the final decision to terminate plaintiff's employment with defendant"). Thus, ULP contends that Davis cannot establish the first factor for proving direct evidence. DN 43-1, PageID# 521-22. Even though Motley had no supervisory authority over Davis at the time of his termination, Davis argues that Motley influenced Slaughter in his position as "decision-maker" and, therefore, her comments to Davis regarding his age are direct evidence of discrimination. DN 52, 1013.

Remarks made by an individual who is not a decision maker "can constitute direct evidence of discrimination" if the individual "significantly influence[s] the decision-making process." *Sharp v. Aker Plant Servs. Grp.*, 726 F.3d 789, 798 (6th Cir. 2013). *See also Ercegovich v. Goodyear Tire & Rubber Co.* 154 F.3d 344, 354-55 (6th Cir. 1998) ("[T]he discriminatory remarks of those who may have influenced the [adverse employment] decision . . . may be relevant when the plaintiff challenges the motive behind that decision."). Davis claims Motley was in a position to influence Slaughter because Slaughter and Motley were "good friends." DN 52, PageID# 1006. As evidence, Davis refers to the following exchange between Davis' counsel and Slaughter during Slaughter's deposition:

> Q (Davis' Counsel): From the time that you became chief of the Division of Cardiovascular and Thoracic Surgery in 2008 until Ms. Motley left her position as executive director, did you and Ms. Motley have a friendship outside of work?
>
> A (Slaughter): I would say that—were we friends? Yes. Did we frequently socialize? No.
>
> Q: Would you and your wife or yourself ever go out for dinner with Ms. Motley on a social basis?
>
> A: Did we attend department functions? Yes. Do I recall inviting Ms. Motley and her husband to dinner with us? No.

14

DN 52-7, PageID# 1090.

Davis also emphasizes the fact that Motley worked for Slaughter from 2008-2019 and claims that Slaughter considered Motley a "valuable asset to his work as a cardiothoracic surgeon" during that time. DN 52, PageID# 1006 (citing to depositions of Motley and Slaughter). He offers the following excerpt from Slaughter's deposition as proof:

> Q (Davis' Counsel): Did you consider Ms. Motley in her role as executive director as kind of your right-hand woman in this case?
>
> A (Slaughter): She was a [sic] important individual and allowed me to perform my many duties for which she was very qualified.
>
> Q: Did you have great respect for her and her abilities in her role as the executive director?
>
> A: Yes, as did all other executive directors within the School of Medicine, as they frequently consulted her with issues and problems.

DN 52-7, PageID# 1090-91.

At the time of Davis' termination, Motley was no longer Davis' supervisor and had not been for some time. DN 52-2, PageID# 1055-56 (indicating that after Davis filed his first internal complaint, Slaughter took over as his supervisor). Based only on the two above passages from Slaughter's deposition, Davis asks the Court to conclude that Motley was influential over Slaughter in his capacity as the decision-maker in Davis' termination. DN 52, PageID# 1014. Yet, in neither of these passages does Slaughter state that he and Motley were "good friends." Even if the Court assumes such a friendship existed, Davis has not shown that Motley swayed Slaughter's supervisory decisions or had the ability to do so. Likewise, Davis does not offer any evidence linking Slaughter's respect for Motley as a competent worker to Motley having significant influence over Slaughter. Thus, there is no obvious connection between Motley's purported

15

statements about Davis' age and Slaughter's decision to discharge Davis a number of months later. Because Davis has not offered direct evidence of age discrimination, he must establish a prima facie case to advance his claim.

### C. Prima Facie Case

A plaintiff can establish a prima facie case of age discrimination by showing: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). The parties to the present case concur that Davis can establish the first and third elements of the prima facie case. DN 43-1, PageID# 522. He was sixty and was discharged from his employment. This is all they agree on. ULP contends that Davis' prima facie fails because he cannot evidence the second and fourth elements—that he was qualified for the position as a surgical first assistant or that the circumstances support an inference of discrimination. *Id.* Each of these arguments will be evaluated below.

### 1. Davis' Qualifications

ULP argues that Davis was not qualified for his position as CFA when he was terminated because he was not meeting ULP's "legitimate expectations" at that time. DN 43-1, PageID# 522. As evidence, ULP points to the fact that Davis was placed on a PIP and emphasizes the "multiple complaints from physicians and co-workers" that Slaughter received about Davis' performance, as well as "two incidents within two weeks following his 30-day performance review" which ULP alleges Davis "jeopardized the lives of patients." *Id.* ULP maintains that Davis has not presented sufficient evidence to show that he was qualified in view of the complaints and incidents it cites. *Id.*, PageID# 523.

16

Davis urges that he was "objectively qualified" for his position as a CFA with ULP because he met the "minimum education and experience" requirements as described in the original job posting. DN 52, PageID# 1017. He further implies that, because the job posting stated "only those candidates whose experience best meets our requirements will be contacted," he must have been objectively qualified for the position. *Id.* Davis asserts that ULP's claim that he was unqualified is "disingenuous" because he was "an experienced, well-respected surgical assistant" and was "actively recruited" by ULP. *Id.* He cites to some "twenty-five (25) letters of recommendation written on his behalf by former supervisors and colleagues" as evidence of his qualifications. *Id.* (referring to letters of recommendation, DN 51-5, PageID# 951).

The Court agrees with Davis in that, to determine if he has presented "sufficient evidence of qualification to support a prima facie case," the Court must only consider Davis' "objective qualifications." *Highfill v. City of Memphis*, 425 F. App'x 470, 473 (6th Cir. 2011) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003) (*en banc*)). Thus, the Court must disregard the defendant's proffered non-discriminatory reason for taking adverse employment action during this step of the analysis. *Id.* Davis must show that his "qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field" and the "inquiry should focus on criteria such as [Davis'] education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 575-76.

Davis properly relies on the job description in the original posting as evidence of the minimum objective qualifications required for the CFA position with ULP. *See, e.g., Flowers v. Westrock Servs.*, 979 F.3d 1127, 1131 (6th Cir. 2020) (looking to the job description as evidence of "the minimum objective criteria for employment in the relevant field") (quoting *Wexler* at 576) (internal quotation marks omitted). Nevertheless, Davis' justification for the assertion that he was

"objectively qualified" based on this description is incomplete. Under *Wexler*, in addition to education and experience, the Court is instructed to also consider the plaintiff's "demonstrated possession of the required general skills." *Wexler* at 576. The ULP job description enumerated the "general skills" a CFA was expected to display under the heading of "Knowledge, Skills, and Abilities," and included characteristics such as "self-awareness," "the ability to work with others," the ability to "anticipate[] and plan[] for problems before they arise," "and the ability to "work[] at a fast pace to ensure optimal efficiency." DN 43-4, PageID# 554. More broadly, the practices of a CFA with ULP were expected to be "in accordance with the current standards of care" and with the "quality criteria adopted by the clinic." *Id.*

"[A]s the one who creates the position in question, the employer largely enjoys the right to decide the qualifications it prefers in one who holds the position." *Flowers*, 979 F.3d at 1131. Davis presents no reason for this Court to question ULP's right to require certain "general skills" or to conclude that these skills exceed "the minimum objective criteria required for employment" as a CFA. It follows then, that to establish a prima facie case, Davis must show that he "at least" had a "demonstrated possession" of these skills. Davis does not address or even acknowledge the "Knowledge, Skills, and Abilities" section of the job posting nor does attempt to proffer an argument that had a "demonstrated possession" of the "general skills" that ULP required.

Davis' use of "stale" satisfactory performance reviews from previous years to maintain the assertion that he was qualified for his job at the time he was terminated has been rejected by the Sixth Circuit. *Webb*, 438 F. App'x at 453.[3] Sixth Circuit cases that allow an employee's past

---

[3] *See also Strickland v. Fed. Express Corp.*, 45 F. App'x 421 at 424 (stating that, to establish a prima facie case of age discrimination, the plaintiff "must present evidence . . . reasonably contemporaneous with the adverse employment action"); *Cruse v. Schneider Electric USA, Inc.* 2018 U.S. Dist. LEXIS 188861, at *18 (E.D. Ky. Nov. 5, 2018) (stating that evidence of an employee's past satisfactory performance is irrelevant, as such evidence "does not necessarily mean he was [meeting expectations] at the time of his [discharge]"); *Shrivastava v. RBS Citizens Bank, N.A.*, 227 F. Supp. 3d 824, 834 (E.D. Mich. 2017) ("[A] stale performance review, without more, may not suffice to establish that a plaintiff is prima facie qualified.").

performance to show that the employee was qualified at the time of an adverse action tend to be cases in which the employee has a long track record, performing the same job for the same employer for many years. *See, e.g.*, *Hale v. ABF Freight Sys.*, 503 F. App'x 323, 333 (6th Cir. 2012) (noting that the plaintiff-employee had worked continuously for the defendant-employer for twelve years, during which time he had consistently received positive performance reviews until he engaged in a protected activity); *Geiger v. Tower Auto.*, 579 F.3d 614, 624 (6th Cir. 2009) (citing the plaintiff-employee's twenty-seven year tenure with the same employer and positive reviews as evidence of his qualification). Those are not the circumstances of the present case and the letters of recommendation Davis offers—the most recent of which is dated more than a year prior to his termination[4]—do not speak to his performance at the time ULP discharged him from employment. *See* DN 51-5, PageID# 951.

Regardless, Davis makes no effort to connect the content of letters to the specific skills listed in the job description. Rather, he simply proffers the letters as blanket evidence that he was qualified for his job. Without more, these letters do not evince that a genuine issue of material fact exists as to whether Davis had a "demonstrated possession" of "the minimum objective criteria required for employment" articulated in ULP's job description.

Finally, Davis maintains that the fact that ULP hired and recruited him is proof that he met the objective qualifications for the job. DN 52, PageID# 1017. This argument is tenuous, as the "general skills" that ULP required could not be demonstrated until after Davis began working. It is assumed that ULP believed that Davis had those skills when he was hired, or he would not have been offered the job. However, this does not mean that Davis was, in fact, objectively qualified at that time or at the time of his discharge. The revelation that Davis did not actually possess the

---

[4] The Court notes that only eleven of the twenty-five letters referenced in the briefing seem to be in the record and, of those eleven, eight appear to be dated from 2014 or earlier.

skills required of a CFA could only come after ULP observed Davis' work for some time. Thus, Davis' qualifications on paper may be entirely disconnected from "demonstrated skills" that he actually possessed on the job. Nonetheless, given the rather low bar for establishing this prong of the prima facie case under Sixth Circuit precedent, the fact that Davis was contacted and selected for the position with ULP is likely sufficient evidence to show he was qualified and to avoid summary judgment on these grounds. *See Levesque v. City of Toledo*, 2011 U.S. Dist. LEXIS 21881, at *10 (N.D. Ohio Jan. 27, 2011) (citing *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

Irrespective of whether this Court finds that Davis met his evidentiary burden on this point, his prima facie case still fails because, for the reasons discussed below, he cannot evidence that he was treated dissimilarly to a younger worker.

### 2. *Davis' Treatment Relative to Younger Employees*

ULP argues that Davis' failure to produce evidence that he was replaced by or treated dissimilarly to a younger worker is fatal to his prima facie case of age discrimination. DN 43-1, PageID# 523-24; DN 58, PageID# 1156-57. Davis admits that he was not replaced by a younger worker, but he contends that he was "treated differently than similarly situated, younger employees." DN 52, PageID# 1018. He claims that two other unidentified CFAs were not required to perform the same administrative tasks as Davis and that Davis' vein harvesting work was scrutinized more closely than the work of these other two individuals. *Id.* Davis does himself not provide the names of the two CFAs that he alleges received better treatment, but he does not challenge ULP's identification of Theresa Ray, age 53, and Sherry Winn, age 62, as the two CFAs to which he was referring. DN 43-1, PageID# 523. Davis was hired at the age of 59 and terminated at the age of 60. DN 43-3, PageID# 548; DN 52-1, PageID# 1028.

A plaintiff can establish that circumstances in his employment support an inference of discrimination by showing that he was replaced by a younger worker or "was treated less favorably than an employee who is at least six years younger." *Moffat v. Wal-Mart Stores, Inc.*, 620 F. App'x 453, 457 n.5 (6th Cir. 2015) ("An ADEA plaintiff need not show that she was treated less favorably than someone outside the protected class. Rather, she must show circumstances that support an inference of unlawful age discrimination. Such circumstances may, but need not, include an allegation that plaintiff was treated less favorably than an employee who is at least six years younger."). *See also Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003) ("[I]n the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant.").

ULP notes that, at some point during her employment, Winn, who was older than Davis, was also counseled about her need for "additional time and experience to improve her skill set." *Id.*, PageID# 524 (citing DN 43-10, PageID# 691-93). As with Davis, Winn was required to log her vein harvesting procedures in an effort "to improve her times and technique." DN 43-10, PageID# 693. However, unlike Davis, Winn showed improvement and was never placed on a PIP. *Id.* The fact that Winn remained employed after Davis was discharged cuts against Davis' claim that he was targeted because of his age.

Ray was seven years younger than Davis at the time he was terminated, but the evidence fails to suggest circumstances sufficient to raise an inference of age discrimination. Davis has alleged that Ray was "not required to perform the same administrative tasks" that had been assigned to him and, unlike Davis, Ray was not required "to have [her] vein harvesting times monitored by anyone." DN 52, PageID# 1018. The vein harvesting times were required because of the PIP which resulted from physician complaints about Davis' performance. Thus, this is not

21

a comparable job duty. Further, the only evidence cited by Davis to support the allegation that Ray was not required to perform the same administrative tasks, is the following excerpt from Davis' deposition, presumably referring to Winn and Ray:

> A (Davis): I saw them go home when cases were done, so I didn't see them do anything else.
>
> Q (ULP's Counsel): So that was purely based on your observation on whether they went home or not?
>
> A: Yes, sir, as far as I know.
>
> Q: Did you ever ask anyone whether the other surgical first assistants had any other administrative duties other than the OR duty?
>
> A: Sherry occasionally did something on the computer. And then, you know, I would want to use that computer and I would ask her how long she was going to be, so—to do whatever, these small little tasks. That would be the conversation about those things.

DN 52-2, PageID# 1057. There is nothing in this exchange upon which to base an inference, much less a reasonable inference, that ULP treated Ray treated differently than it treated Davis. Davis offers only speculative conclusions about Ray and Winn's administrative assignments based on his observation that they left work upon the completion of the day's cases and that he "didn't see them do anything else." In fact, Davis' responses suggest that Winn may have actually had tasks to perform on the computer, at least on occasion. Additionally, Davis has not articulated how a difference in administrative task assignments, if true, would support his claim of age discrimination. Thus, Davis fails to offer evidence to support an element of his prima facie case.

In sum, this Court finds that, based on the evidence Davis has put forth, a reasonable jury could not conclude that he was subjected to age discrimination. However, the Court will still provide an analysis of ULP's proffered non-discriminatory reason for terminating Davis and pretext.

### D. Non-Discriminatory Reason and Pretext

Davis' claim also cannot advance because ULP has offered a "legitimate and nondiscriminatory" reason for terminating his employment and Davis has not offered evidence of pretext. In the termination letter sent to Davis, ULP stated that Slaughter "made the decision that [Davis'] continued employment would result in unsafe operating procedures," which is a legitimate and non-discriminatory reason for Davis' termination. DN 43-17, PageID# 745; *Wilson v. Cleveland Clinic Found.*, 579 F. App'x 392, 400 (6th Cir. 2014) (finding that an employer cited a legitimate, non-discriminatory reason for suspending an employee who engaged in "actions detrimental to patient safety").

To survive summary judgment, Davis has to establish that ULP's proffered rationale for its decision is merely pretextual. *Wexler*, 317 F.3d at 576. Davis must thus show that the rationale "either: (1) had no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action." *Id.* Further, he is required to do more than evince "a dispute over the facts"—he must also offer "sufficient evidence from which the jury could reasonably reject" ULP's proffered reason for his discharge and infer that ULP "intentionally discriminated" against him due to his age. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (quoting *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246-47 (6th Cir. 1997)).

ULP argues that Davis' claim must fail because he cannot "produce sufficient evidence from which a jury could reasonably reject [ULP's] explanation of why it fired [him]." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). ULP's explanation for terminating Davis was based on Slaughter's judgment that Davis' continued employment would create a threat to patient safety. DN 43-1, PageID# 525-26; DN 43-17, PageID# 745-46. ULP contends that Slaughter's opinion was based on a review of "multiple statements from multiple providers citing errors in the

operating room that caused great concern for patient safety" at a time when Davis' performance was already being evaluated under the PIP. DN 43-17, PageID# 745. Thus, to show that ULP's decision was pretextual, Davis must show that the performance deficiencies ULP alleges had no basis in fact, that Slaughter's opinion was not actually based on these alleged performance deficiencies, or that these alleged performance deficiencies were insufficient to motivate Slaughter to form such an opinion. *Wexler*, 317 F.3d at 576. He must also offer sufficient evidence for a jury to infer that Slaughter's decision was based on Davis' age. *Braithwaite*, 258 F.3d at 493-94.

1. *Basis in Fact*

Davis has not shown evidence that the alleged deficiencies in his performance had no basis in fact. While he makes the general assertion that ULP's "allegations of poor performance were not supported by credible evidence," he has not shown that ULP's criticisms of his work lacked factual support. DN 52, PageID# 1021. First, he purports that "representatives" of ULP "fabricated" the facts it used as a basis for his termination, but he does not specify which facts were fabricated and provides no evidence of fabrication. DN 52-12, PageID# 1114. Second, he makes the claim in his briefing that Motley and Slaughter "solicited and compiled" complaints about his performance from "physicians and other medical providers," yet he does not contest the truthfulness of what is stated in most of these complaints. DN 52, PageID# 1008, 1024.[5]

Finally, Davis disputes ULP's assessment that he was at fault for the for the ET tube being cut on September 18 and for the vein being dropped on the floor September 21. DN 52, PageID# 1009. However, other than deflecting blame for those two specific acts, Davis does not contest the

---

[5] For example, Davis has not disputed Slaughter's claim that he stood "with [his] arms folded and did not participate" during a procedure on September 17, Sell-Dottin's comment that he "doesn't anticipate next steps well," or Sell's notes about talking at "inappropriate times" and not responding "to appropriate suggestions/coaching." DN 43-14, PageID# 729, 731, 732. He also does not refute the length of time it took him to harvest the vein on September 21 or Sell's assessment that the harvest was "low quality." DN 43-14.

accounts of these events as described by ULP providers. Disregarding who was ultimately responsible for cutting the tube or dropping the vein, an examination of the remaining details surrounding these events reveals that Slaughter had a factual basis for his concerns about patient safety.

For instance, Davis has not refuted most of what Nurse Hobbs included in her description of what happened on September 18. Hobbs reported that Davis was unsure about the details of the procedure that he was about to perform that day until the very last moment. DN 43-14, PageID# 727. Hobbs also indicated that Davis had already "been asked multiple times by circulating nurses to slow down when cutting drapes off" before he accidentally cut a patient's ET tube while cutting the drapes from a patient at the end of the procedure. *Id.* Further, Hobbs claims that, after cutting the ET tube, Davis did not even tell the attending physician what had occurred or assist with correcting his mistake. *Id.* Davis has not contested these facts.

Regarding the incident in which Davis was reported to have dropped a vein on the floor during a surgery on September 21, 2018, Slaughter testified:

> It took [Davis] . . . over two hours to get the vein out. As a rule of thumb by the Institute of Medicine, [this procedure] from skin incision until when they leave the room should be 180 minutes. So it took him longer to procure the vein than it should be to do the entire heart operation. . . . [O]nce the vein was out, it took 30 minutes to fix it, and then he dropped it on the floor.

DN 37-3, PageID# 228 (referring to Sell's notes, DN 43-14, PageID# 732). Slaughter further explained that, according to Sell's notes, "there were multiple injuries to the vein" and that during the harvesting process, Davis applied "several clips" to the vein that "damaged the mid portion, requiring the vein to be cut in half, and . . . [used] as two pieces. . . . [H]e permanently injured the vein." *Id.*, PageID# 230. Other than disputing that he was not solely at fault for the vein being dropped on the floor, Davis has not provided a counterfactual explanation of these events.

In sum, Davis has failed to show that Slaughter lacked a factual basis for his opinion that Davis' continued employment would create a risk to patient safety. Therefore, to establish pretext, Davis must evidence either that Slaughter did not actually arrive at this conclusion based on Davis' alleged performance deficiencies or that these alleged deficiencies were an insufficient reason for Slaughter to arrive at such a conclusion.

2. *Motivation for Slaughter's Opinion*

When, in an effort to show pretext, a plaintiff seeks to raise doubts about the motivation behind an employer's business decision, the plaintiff can attack the reasonableness of the decision. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 n.6 (6th Cir. 2008). A plaintiff can establish pretext in this way if the plaintiff shows that "'the employer failed to make a reasonably informed and considered business decision, thereby making its decisional process unworthy of credence.'" *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-808 (6th Cir. 1998) (internal quotation marks omitted)). However, the court "is not a 'super personnel department' tasked with 'second guessing employers' business decisions.'" *Treadway v. Cal. Prods. Corp.*, 659 F. App'x 201, 210 (6th Cir. 2016) (quoting *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 (6th Cir. 2013). "[A]n 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 886 (6th Cir. 2020) (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)). As always in ADEA cases, the plaintiff bears the burden of showing that the adverse employment action was motivated by a discriminatory animus based on age. *See id.* ("The ADEA only prevents employers from terminating an employee "because of such individual's age.").

Davis claims that the "allegations of [Davis'] poor performance were not . . . used as the actual basis" for Slaughter's opinion and that "reasonable jurors could differ as to whether the Defendant's proffered reason for his termination was merely a pretext to discrimination on account of age." DN 52, PageID# 1021-22. To challenge the reasonableness of Slaughter's opinion that Davis' continued employment would create a threat to patient safety, Davis utilizes a two-prong strategy of shifting blame and discounting the significance of his alleged performance deficiencies. *E.g., id.*, PageID# 1009 ("Plaintiff was falsely accused of and found solely to blame for a vein that was to be used for cardiac by-pass surgery falling to the floor."); *id.*, PageID# 1021 (stating that "the severity of the incident involving the vein dropping to the floor is much less dramatic" than Slaughter's assessment and implying that, when Davis cut the ET tube, the patient's safety was not threatened because "the patient remain[ed] intubated").

Davis relies on the opinion of Dr. Paul Brown and letters of recommendation from previous employers and colleagues to show that the rationale behind Slaughter's opinion is unreasonable and, hence, that ULP's proffered reason for his termination is mere pretext. DN 52, PageID# 1020-21. Brown is a cardiothoracic surgeon at Southside Regional Medical Center in Petersburg, Virginia with whom Davis worked for about six months after his employment with ULP was terminated. Amended Expert Witness Disclosure, DN 45-1, PageID# 824-25. In his expert report, Brown repudiates the evidence presented by ULP in support of Davis' termination and speaks about his own experience working with Davis. *See generally* DN 45-1.

ULP has filed a motion to exclude Brown's testimony, claiming that it is not reliable and includes impermissible findings of fact, inferences about the motives of other parties, and draws legal conclusions. DN 44; Mem. in Support, DN 44-1, PageID# 766-72. Further, ULP alleges that Brown's opinions are unnecessary, as the triers of fact can understand the issues involved without

expert testimony, and that Brown's testimony would unfairly prejudice and potentially mislead a jury. *Id.*, PageID# 773-74. While ULP's arguments are not without merit, particularly with respect to certain excerpts of Brown's proffered testimony, for the reasons discussed below, the Court need not render judgment on ULP's motion to exclude in order to grant summary judgment on Davis' discrimination claim. Even if the Court found Brown's testimony to be admissible in its entirety, Davis still fails to show that Slaughter's opinion is merely a pretext for age discrimination.

Brown's opinions about Davis' performance while at ULP are based on a review of certain documents in the record, including the letters of recommendation, through the lens of his experience working with Davis and as a cardiothoracic surgeon. DN 45-1, PageID# 824. Brown questions the validity of the concerns ULP raised in Davis' PIP, including his lack of initiative, his insubordination, and an "inappropriate" confrontation Davis had with a ULP surgeon, because there was no evidence of Davis exhibiting such conduct in other jobs, including when Davis worked with Brown. *Id.*, PageID# 828-29 (referring to PIP, DN 43-19, PageID# 756). He is equally dismissive of certain observations about Davis' conduct documented by Slaughter. *Id.*, PageID# 829-30. He even goes so far as to ascribe a motive, stating, "it appears highly likely to me that . . . the comments made by Dr. Slaughter . . . [were] written . . . to document trivial issues or plac[e] unwarranted blame on Mr. Davis in an effort to document reasons to support his termination." *Id.*, PageID# 829. Brown also declares that Davis' vein harvesting times "should not and would not be concern for any surgeon in any operating room anywhere" and that neither the dropping of the vein nor the cutting of the patient's ET tube created "a grave threat to patient safety" and should not be grounds for termination. *Id.*, PageID# 827, 830-32.

Without addressing its admissibility, the Court finds that the information provided in Brown's expert report is insufficient to call into question Slaughter's decision to recommend

Davis' termination. Slaughter reasonably based his decision on uncontested, particularized facts completely distinct from Davis' age. In his report, Brown restates facts and arguments from Davis' brief but adds no expert analysis. His opinions are largely conclusory and, although Brown asserts that he is qualified to render an opinion consistent with national standards of care, he does not ground his opinions in any such standards. Thus, there is no metric offered to call into question Slaughter's conclusion. Rather, Brown's opinion is simply the opinion of another surgeon. For example, Brown does not cite to any authority or national standards to support his statements that Davis' vein harvesting times would not be a problem "for any surgeon in any operating room anywhere," that "[n]obody gets fired" for dropping a vein on the floor, or that cutting an ET tube was not "grounds for termination" and "under any other circumstances" a surgeon would have just told Davis to "be a little more careful." DN 45-1, PageID# 827, 831. He merely makes these bald assertions unadorned. Offered as expert testimony, these statements are clearly hyperbolic and beyond this surgeon's own experience, thus the admissibility of these statements is highly questionable. Even so, that Brown or any other physician might be more forgiving of certain mistakes does not show that Slaughter "failed to make a reasonably informed and considered business decision" or that Slaughter's process for making his decision is "unworthy of credence." Without such proof, any "'disagreement with [Slaughter's] honest business judgment regarding [Davis'] work does not create sufficient evidence of pretext in the face of the substantial evidence that [Slaughter and ULP] had a reasonable basis to be dissatisfied.'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001)).

In establishing pretext, Davis must also show that his discharge was actually the product of unlawful discrimination. *King v. Buckeye Rural Elec. Coop.*, 2000 U.S. App. LEXIS 8056, at

*18-19 (6th Cir. Apr. 20, 2000). As such, Davis must provide sufficient evidence from which a reasonable juror could believe his theory that Slaughter and ULP were motivated by an age-based discriminatory intent. *See Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246-47 (6th Cir. 1997) ("[I]t is not enough . . . to *dis*believe the employer['s proffered nondiscriminatory reasons]; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)). Nothing Davis has presented supports such an inference.

Davis' claim relies heavily on his insistence that Motley's purported comments about his age evidence that his termination was due to his age. DN 52, PageID# 1014, 1021-22. The fact that Motley was also the individual who extended Davis his employment offer, when he was fifty nine (DN 43-2, PageID# 534), less than a year earlier weighs against a suggestion of age-based bias in her comments to him when discussing concerns about his performance. Motley's comments were investigated by UofL and found to be benign. Even so, she was removed from direct supervision of Davis to address any such concerns. We note that although Davis surmises that there was a tacit joint effort between Motley and Slaughter to build a case against him, he has no evidence to reasonably support an inference that age-based animus existed. Thus, Davis has failed to raise any genuine issue of material fact substantiating his contention that Motley's alleged remarks evidenced age-based bias or that such remarks were linked to discriminatory conduct. *See, e.g., Wexler v. White's Fine Furniture*, 317 F.3d 564, 573-74 (6th Cir. 2003) (discussing the application of the "same-actor inference" in a case of hiring and demotion).

Davis also puts forth some alleged remarks made by his co-workers as evidence in support of his claim of age discrimination. DN 52, PageID# 1004-05. However, as previously discussed, Davis has not linked these remarks to ULP's decision to terminate him. In any event, the ADEA is not to be used as a "general civility code." *Amini v. Rite Aid Corp.*, 819 F. App'x 344, 348 (6th

Cir. 2020) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 786-88, (1998) (internal quotation marks omitted)).

Of the two CFAs that he claims ULP treated more "fairly," one was older than Davis at the time of Davis' termination and she continued to be employed by ULP after Davis was dismissed. DN 43-1, PageID# 523, 524; DN 43-18, PageID# 753. Regarding the younger employee, Davis contends that she was enjoying better treatment from ULP. DN 52, PageID# 1018. Yet the deposition testimony Davis cites as evidence of this "disparate" treatment is insufficient to allow one to draw a reasonable inference about ULP's treatment of other CFAs. DN 52-2, PageID# 1057. Davis also does not point to any evidence in the record that suggests that ULP allowed any employee, older or younger, who committed similar errors to Davis to continue working without similar disciplinary action. Davis' "mere personal belief, conjecture and speculation are insufficient to support an inference of age discrimination." *Woythal* at 247 (quoting *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986)) (internal quotation marks omitted)).

In sum, there is no probative evidence in the record that would allow a reasonable juror to conclude that Slaughter's opinion and, hence, ULP's proffered reason for his termination, was pretextual. As such, Davis has not shown that a genuine issue of material fact exists as to whether ULP terminated him because of his age. ULP is, thus, entitled to summary judgment as a matter of law. The motion will be granted in a separate order.

### VI.   Retaliation Claim

#### A.   Applicable Law

Under KCRA, it is unlawful "[t]o retaliate . . . in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or

hearing under this chapter." Ky. Rev. Stat. Ann. § 344.280(1) (West). Retaliation claims filed under this Kentucky law are evaluated under the same standard used to evaluate federal Title VII claims. *Land v. S. States Coop., Inc.*, 740 Fed. App'x 845, 848 (6th Cir. 2018) (citing *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014)); *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 801-02 (Ky. 2004).

In the absence of direct evidence of retaliation, a plaintiff must establish a prima facie case. *Hamilton v. GE*, 556 F.3d 428, 435 (6th Cir. 2009) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-05 (1973)). An employee can substantiate a prima facie case of retaliation against his employer by showing that "(1) [the employee] engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.* (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (internal quotation marks omitted)). If the employee is successful, the burden then shifts to the employer to evidence a non-retaliatory reason for the action taken against the employee. *Id.* Finally, if the employer meets this burden, the employee must show that the reason offered by the employer is pretextual. *Id.*

B.  *Prima Facie Case*

The parties do not dispute that Davis' retaliation claim is based on circumstantial, not direct, evidence and, hence, Davis must establish a prima facie case. DN 52, PageID# 1022. There is also no disagreement that Davis engaged in protected activity by filing internal and EEOC age discrimination complaints or that ULP knew of these filings. Further, as already addressed, the one adverse act that this Court is considering in this opinion is the termination of Davis' employment.

As such, the only remaining dispute lies in whether Davis can establish a causal connection between the filing of his claim and his termination.

### C. Causation

ULP denies that a "causal connection" exists between Davis' protected activity and his termination because Davis was discharged as "a direct result of Davis's prior and ongoing poor performance." DN 43-1, PageID# 528. To establish a causal nexus between an employee's protected activity and an employer's adverse employment action, the employee "must produce sufficient evidence 'from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not' engaged in protected activity." *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 885, 910 (W.D. Ky. 2015) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). In cases where there is no direct evidence of a causal connection, an inference of causation can generally be drawn if the employee shows that "(1) the decision maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and (2) there is a close temporal relationship between the protected activity and the adverse action." *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 804 (Ky. 2004).

However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Tuttle v. Baptist Health Med. Grp., Inc.*, 379 F. Supp. 3d 622, 639 (E.D. Ky. 2019) (quoting *Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 504 (6th Cir. 2014) (internal quotation marks omitted)). While there is no bright line defining "close" temporal proximity, causation has been inferred up to "just shy of the

ten-week mark" between an employer learning of an employee's protected activity and an adverse employment action. *Stein v. Atlas Indus.*, 730 Fed. App'x 313, 319 (6th Cir. 2018).

Nonetheless, in many circumstances, two of which are of note in this case, close temporal proximity alone is inadequate to establish causation.[6] First, if the employer carries out an adverse employment act already contemplated prior to the employee's protected activity, courts "must not take the temporal proximity of the adverse employment action as evidence of causality." *Montell*, 757 F.3d at 507 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). In this situation, the court should "analyze the evidence of how and when the adverse employment action occurred to determine if it squares with the action previously contemplated." *Id.* "[W]here an employer deviates from [lines previously contemplated], temporal proximity can certainly be evidence of causality." *Id*.

Second, if an "intervening reason" for taking action against the employee arises between the time of the employee's protected activity and the time of the employer's adverse action, temporal proximity by itself will not be sufficient for establishing a causal connection. *See, e.g., Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013) (upholding dismissal of the plaintiff's claim of retaliation because the plaintiff's "extended discretionary leave and . . . failure to return to work" after he made a complaint gave rise to "an intervening reason" to terminate the plaintiff's employment).

---

[6] The Sixth Circuit has, in some cases, found a causal connection on the basis of temporal proximity alone when the "'adverse employment action occurs very close in time after an employer learns of a protected activity.'" Hamilton, 556 F.3d at 435 (quoting Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008)). However, the court has "rarely found a retaliatory motive based only on temporal proximity." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). *See also Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 471-72 (6th Cir. 2012) ("[W]e have repeatedly cautioned against inferring causation based on temporal proximity alone.").

In *Lewis-Smith v. Western Kentucky University*, the court rejected the plaintiff's attempt to causally connect the termination of her employment to a complaint that she had made four months earlier. 85 F. Supp. 3d 885, 911-12 (W.D. Ky. 2015). The court declared that, "without more," the timing of the plaintiff's termination relative to her complaint did not raise an inference of causation. *Id.* at 911. Even if the temporal proximity was close enough to raise an inference, the court stated that the plaintiff's conduct after submitting her complaint gave rise to an "intervening legitimate reason" to terminate the plaintiff's employment. *Id.* at 911-12. Specifically, the court pointed to the plaintiff's performance issues after her complaint and the fact that the plaintiff made insulting comments to her supervisor the week before she was terminated. *Id.* at 911. The court concluded that these actions "dispelled" any inference of causation and, hence, the plaintiff failed to establish a prima facie case of retaliation. *Id.* at 911-912.

ULP contends that, irrespective of the close temporal proximity of the filing of Davis' complaint and his discharge from employment, the evidence is clear that ULP contemplated disciplinary action against Davis prior to his complaints. DN 43-1, PageID# 529-31. Davis was placed on a PIP less than a week before he filed the age discrimination complaint. The PIP stated, "[P]lease understand that you remain subject to disciplinary action related to either unsatisfactory performance, or a violation of ULP policies and procedures. Additionally, it is expected that you will show marked improvement during the next thirty (30) calendar days. Failure to meet the performance expectations and show improved performance may result in termination of employment." DN 43-19, PageID# 757. Thus, the Court finds that any decision to terminate Davis' employment after he filed his complaint "squares with the action previously contemplated" in the PIP and does not suggest retaliation.

35

ULP also asserts that any inference of retaliation raised by the close temporal proximity of Davis' complaint and his termination is dispelled by Davis' own conduct after filing his complaint. DN 43-1, PageID# 531. When Slaughter met with Davis on September 12, about a month after Davis filed his complaint, Slaughter informed Davis that his "performance was still being reviewed and not meeting . . . standards." DN 52-2, PageID# 1061. In the subsequent weeks, Slaughter received multiple complaints about Davis' performance, including the events of September 18 and September 21, 0218. *See* DN 43-14.

Davis' rebuttal to ULP's argument that he lacks a showing of causation is not well-defined. Davis seems to suggest that the act of ULP placing certain "documented allegations . . . of 'poor performance' and 'patient safety' issues" into his employee file constitutes an adverse act. DN 52, PageID# 1024. Then, to raise an inference of retaliation, Davis relies on the "close temporal proximity" between the filing of the age discrimination complaints and ULP's placing of these documents into his file. *Id.* For reasons previously discussed, the only adverse action the Court recognizes in this case is Davis' termination. Davis does not offer any evidence to raise an inference of a causal connection between the filing of his complaints and his termination. Even if he had, he provides no justification for rejecting ULP's contentions that disciplinary action against Davis was contemplated prior to his complaints or that any inference of causation is dispelled by Davis' conduct subsequent to filing his complaints.

The remainder of Davis' argument regarding causation is based on an uncorroborated conspiracy theory, in which he claims that Slaughter and Motley worked together to "rid" him from ULP by "zealously seeking to compile . . . adverse performance reviews or statements from various medical providers . . . in his file to support his ultimate termination." DN 52, PageID# 1024. Even if this theory had evidentiary support, it does not refute the validity of the performance

deficiencies noted by multiple ULP providers after Davis' complaint was filed and, hence, does not undermine ULP's factual basis for discharging Davis from employment. It also does not establish a causal connection between the filing of his complaints and his termination. Therefore, Davis has not proven a prima facie case of retaliation and ULP is entitled to summary judgment as a matter of law. The motion will be granted in a separate order.

November 19, 2021

Charles R. Simpson III, Senior Judge
United States District Court